IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CASEY SACCO, | CIVIL DIVISION |
| Plaintiff, | Case No. 2:25-cv-00848 |
| v. | |
| F 5 FACILITIY SERVICES, | |
| Defendant. | |

### COMPLAINT AND JURY DEMAND

A.   *Preliminary Statement*

1. The plaintiff Casey Sacco brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* to redress violations of her right to be free from employment discrimination, harassment and retaliation based upon her gender and perceived sexual orientation. Because of the violations described herein, this Court is also empowered to exercise pendant jurisdiction pursuant to the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 *et seq.* when those claims are raised via an amended complaint upon their maturation on April 2, 2026. A jury trial is demanded.

B.   *Jurisdiction*

2. The jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 2000e *et seq* and under the doctrine of pendant jurisdiction (when the state law claims mature on April 2, 2026).

3. On or about April 23, 2025, the plaintiff filed a timely charge alleging discrimination with the Equal Employment Opportunity Commission ("EEOC"), docketed at 533-2025-01686. This charge was simultaneously cross-filed with the Pennsylvania Human Relations Commission

4. The EEOC issued a Notice of Right to Sue on June 2, 2025.

5.  This complaint is filed within 90 days of receipt by the plaintiff of the Notice of Right to Sue.

C.  *The parties*

6.  The plaintiff is an adult individual who resides in Pittsburgh, PA (Allegheny County).

7.  F 5 Facility Services ("F5") is an entity doing business in the Commonwealth of Pennsylvania, and, specifically, in this district.

8.  At all times material, the defendant employed more than fifteen employees.

9.  The defendant was the plaintiff's employer and is an employer within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e(b).

D.  *Factual Background*

10. The plaintiff was employed by F5, from January 13, 2025 until March 13, 2025.

11. F5 provides plumbing, electrical, restoration and handyman services for businesses.

12. The plaintiff's job was billing and collections.

13. At all times relevant, the plaintiff performed the functions of her job competently and efficiently and was considered to be a satisfactory employee.

14. At all times relevant:

    (a)  Stephen and Forrest Passerin were the Owners of F5.

    (b)  Michael Lewis was the President.

    (c)  Shane Turosky was the Vice President/HR.

    (d)  Rachel Sinciline was the Billing Manager.

    (e)  Jeff Cortright was the Electrical Manager.

  (f)  Savannah Young was a coworker in the billing department who was transitioning into an HR/Billing Associate.

  (g)  Kassidi Horrell was a coworker in the restoration department.

  (h)  Jason Mack was the coworker who got hired for the Assistant Electrical Manager position.

15. Starting on approximately January 27, 2025, Sinciline, the plaintiff's supervisor, started calling the plaintiff a "dike." She called the plaintiff a dike every single day, and sometimes more than once during a day. This constant barrage made the plaintiff extremely uncomfortable, especially since she never shared or talked about her sexual orientation with any of the employees. The plaintiff is heterosexual.

16. In addition to insisting that the plaintiff was a "dike" and calling her that every day, Sinciline joked with Young that the plaintiff was a "dike" and they laughed about it.

17. On several occasions, Sinciline walked up to the desk in front of the plaintiff and would make a show of rubbing her crotch against the corner. After doing so, she would say, "Bet you never thought your manager would rub her vagina on the desk," and laugh.

18. The plaintiff repeatedly requested Sinciline not to call her names. These requests did not deter Sinciline and she ignored them. Instead, Sinciline started retaliating against the plaintiff in the following ways:

  (a)  Sinciline subjected the plaintiff's work to heightened scrutiny.

  (b)  Sinciline told other managers that the plaintiff was not doing her work properly and/or was making mistakes.

  (c)  Sinciline sent "examples" of the plaintiff's "mistakes" to other managers, even though she had no legitimate reason to do so.

  (d)  Sinciline required the plaintiff to do additional work, including more billing assignments and making more calls for collections, while Young was permitted to take naps in the office and watch Tik-Tok videos because the plaintiff had to do the work that should have been assigned to her.

19. After enduring Sinciline's abuse for a month, the plaintiff learned that an Assistant Electrical Manager position was open. On February 13, 2025, she decided to apply for this role so that she could move out of the uncomfortable situation in the Billing Department with Sinciline. She approached Turosky about the job. At first, he was hesitant about allowing her to apply and be interviewed for the job. Later that evening he sent her an email advising her that she could apply for the position and that her interview was scheduled for the following morning.

20. The plaintiff had the interview at 8:30 am on February 14, 2025. Lewis, Turosky and Cortright were present. The interview lasted approximately an hour and twenty minutes. They talked about the duties and responsibilities of the position and the pay that was being offered ($50,000 salary to start, increased to $55,000 after six months). However, for most of the interview, Lewis and Turosky actively and persistently discouraged her from taking the position, saying things like, "Casey, if you take this job, you're crazy; we just gave you every reason not to." Only Cortright seemed supportive of the plaintiff's candidacy. Lewis and Cortright also made it a point to tell the plaintiff that no female had every worked in this position. They said that they have had female *assistants* but never any female *manager assistants*. The plaintiff refused to withdraw her application and told Lewis, Turosky and Cortright that she really did want the job.

21. After the interview, the plaintiff returned to her workspace to begin her day. Sinciline was aware that the plaintiff had applied for the assistant manager position. She told the plaintiff that Lewis and Turosky had discussed her application the previous evening and had already determined that the plaintiff would not be offered the job. Further, Sinciline reported that they had talked to her and found it "strange" that the plaintiff was applying for the job.

4

Sinciline finished off by saying that they had "low-balled" the plaintiff regarding the salary because she is female.

22. The plaintiff was not told by Lewis or Turosky whether she got the job or not. The plaintiff subsequently found out that Mack (a male) was hired for the role.

23. On or about Friday, February 21, 2025, the plaintiff went to Turosky's office to ask about her eligibility to receive health insurance benefits. During the conversation, Turosky asked the plaintiff about how things were going in the billing department. The plaintiff told him about Sinciline's verbal harassment and disparate treatment. She specifically told Turosky that Sinciline called her a "dike" on a daily basis and joked about it with Young.

24. Turosky took a lot of notes during this meeting. He assured the plaintiff that Sinciline's behavior was inappropriate and he promised to address the situation with Lewis. Turosky then asked the plaintiff whether she was "unhappy" with her job. The plaintiff denied that she was unhappy with the job itself; rather, she stated that she was unhappy with the way Sinciline was harassing her. She also told Turosky that she believed that Sinciline had told him that she hated her job in an effort to get her in trouble. Finally, she requested Turosky to review the security camera footage in the billing department because it would corroborate what she was telling him. Turosky told the plaintiff to go back to her workspace and act as if nothing had happened. The plaintiff complied.

25. Later that day, the plaintiff was called to meet with Lewis and Turosky in Lewis' office. They told her that she would be transitioning to an Electrical Dispatch position effective Monday, February 24, 2025. They made it clear that this was mandatory; she was not given a choice.

26. The plaintiff was happy to have this new position because Sinciline was no longer her supervisor. She now reported to Cortright. However, Sinciline continued to try to undermine the plaintiff by sending emails to the service team claiming that the plaintiff was not invoicing things correctly. Cortright saw these emails, noticed that the plaintiff was getting upset about the situation and told her to disregard them. He acknowledged that Sinciline's contentions were unjustified and told her not to worry about it. Notably, Cortright did not subject the plaintiff to any discipline regarding Sinciline's "complaints."

27. On February 27, 2025, just six days after the plaintiff had complained to Turosky about Sinciline's verbal harassment, everyone in the office received an email from Lewis about mandatory sensitivity training scheduled for March 7, 2025.

28. The plaintiff attended the sensitivity training program on March 7. Henderson Brothers Insurance representatives conducted the session on workplace harassment and lawsuits. Lewis and Turosky were present, along with the office staff. Notably, none of the managers, including Sinciline, attended. During the training, several jokes were made by the insurance representatives, Lewis and Turosky about the subject matter, which undermined the seriousness of the topic.

29. Later that day, Horrell (who had also been subjected to harassment by Sinciline) and the plaintiff were called into a meeting with Lewis in his office. Lewis asked them about the situation with Sinciline and they both provided a description of Sinciline's inappropriate behavior. The plaintiff told Lewis about how Sinciline constantly called her a dike and the other inappropriate conduct. Lewis promised to arrange a meeting with the company owners to discuss the issue. He sent an email to Sinciline, Horrell, Young, the plaintiff and Stephen and Forrest Passerin scheduling a meeting for March 11, 2025.

30. The March 11 meeting was canceled by Lewis. No reason was given. Later that day, Lewis send an email to the plaintiff requesting a written statement regarding the harassment by March 14. The plaintiff immediately wrote a statement and hand-delivered it to Lewis the same day.

31. Two days later, on March 13, 2025, the plaintiff was called into a conference room and met with Forrest Passerin and Lewis. Lewis handed the plaintiff a letter stating that her position was being terminated. The reasons given for her termination were as follows:

*Restructuring:* "an [sic] service department restructuring to steamline operations"

*Financial Reasons:* "economic conditions and a need to reduce operating costs"

*Position Elimination:* "the elimination of your specific position due to business needs"

32. The plaintiff expressed her concern that she had reported harassment and gender discrimination and discrimination based on (perceived) sexual orientation and was being terminated just two days later. They told her that her termination was "unrelated" to those reports. The plaintiff also asked about who else was being laid off due to "restructuring," "financial reasons," and "position elimination." Passerin and Lewis told her that she was the only one being let go from the Pittsburgh office.

33. The plaintiff was terminated in retaliation for raising concerns about discriminatory harassment to the attention of management. Further, she did not get the promotion to Assistant Manager and was terminated because of her gender. Finally, she was terminated because of her (perceived) sexual orientation. The reasons provided by F5 were mere pretexts.

## **FIRST CAUSE OF ACTION**

34. The preceding paragraphs are incorporated herein by reference as if they were set forth at length.

35. The plaintiff is female and thus is protected against harassment and discrimination on the basis of her gender and sexual orientation (perceived or otherwise) under Title VII.

36. The plaintiff was qualified for her position.

37. As detailed above, the plaintiff was subjected to a hostile workplace because of her gender.

38. Despite her qualifications, the plaintiff was discharged.

39. The defendant's harassment and discharge of the plaintiff were in violation of Title VII because it was based upon her gender and sexual orientation (perceived or otherwise).

40. In addition to harassment and discrimination based on gender and sexual orientation (perceived or otherwise), the plaintiff was retaliated against for engaging in protected activity, i.e., that she complained to management about being the harassment.

41. The defendant's violations of Title VII were committed with intentional or reckless disregard for the plaintiff's federally protected rights.

WHEREFORE, the plaintiff respectfully requests judgment be entered in her favor and against the defendant and that the defendant be required to provide all appropriate remedies under Title VII, the ADA, and the PHRA (when those claims mature on April 2, 2026), including attorney's fees and costs.

Respectfully submitted,

*/s/ Michael J. Bruzzese*
Michael J. Bruzzese
Pa. I.D. No. 63306

220 Koppers Building
436 Seventh Avenue
Pittsburgh, PA 15219

(412) 281-8676
mjb@mjblawoffice.com

Counsel for the plaintiff

Dated: June 19, 2025